**In re SAMUEL Y.**

**No. 2004–349–Appeal.**

Supreme Court of Rhode Island.

April 12, 2006.

Catherine A. Gibran.

Karen Clark, Providence.

Frank P. Iacono, Jr.

**O R D E R**

This case came before the Court for oral argument on February 2, 2006, pursuant

to an order directing the parties to appear and show cause why the issues raised in this appeal should not be summarily decided. The respondent-father, Kyle Y. (respondent), appeals from a Family Court order terminating his parental rights to Samual Y.[1] Because we are satisfied that cause has not been shown, we proceed to decide the issues raised in this appeal at this time.

Samual Y., born on November 17, 2001, was first placed in the care of the Department of Children, Youth and Families (DCYF) when he tested positive for cocaine at birth. On March 7, 2002, after the child's mother admitted to allegations of neglect and respondent admitted to allegations of dependency, Samual was committed to the custody and control of DCYF.[2] DCYF initially filed a petition to terminate respondent's parental rights on December 24, 2002. However, on May 7, 2003, DCYF withdrew that first petition in order to give respondent an opportunity to comply with a case plan for reunification. Several months later, on March 22, 2004, DCYF filed a second termination petition, which is the subject of respondent's appeal.

A trial on the termination of parental rights petition was held in Family Court in July and August of 2004. After the trial concluded, the trial justice issued a written decision on August 20, 2004, granting DCYF's petition to terminate respondent's parental rights. The trial justice based her decision in part on her finding that the child had been in the legal care and custody of DCYF for at least twelve months with no substantial probability of a safe return to respondent's care within a rea-

sonable period of time. *See* G.L.1956 § 15–7–7(a)(3). As an additional basis for her decision to terminate respondent's parental rights, the trial justice found that respondent had exhibited behavior or conduct that was seriously detrimental to the child for "such duration as to render it improbable for the father to care for the child for an extended period of time." *See* § 15–7–7(a)(2)(vii). A final decree was entered on September 9, 2004, and respondent timely filed a notice of appeal.

When reviewing a decree terminating a person's parental rights, this Court examines the record to determine whether legally competent evidence exists to support the findings of the trial justice. *In re Unique T.*, 822 A.2d 182, 183 (R.I.2003). It is well settled that the trial justice's findings are entitled to great weight and will not be disturbed on appeal unless they are clearly erroneous or unless the trial justice overlooked or misconceived material evidence in making the findings. *Id.*

The trial justice in this case found that DCYF had established by clear and convincing evidence that respondent was unfit to parent Samual "by reason of his conduct and/or conditions seriously detrimental to the child." She further found that terminating respondent's parental rights was in Samual's best interests. It is our opinion that there is ample legally competent evidence in the record to support the trial justice's findings in these respects.

Specifically, the record contains substantial evidence that respondent has a severe schizotypal personality disorder, the symptoms of which include self-defeating behav-

**1.** There is a lack of consistency in the record with respect to the spelling of the child's name. Although the parties refer to the child as Samuel in their briefs, we shall refer to him as Samual, which is the spelling reflected on his birth certificate.

**2.** The mother's parental rights were terminated by default on May 7, 2003, and no appeal was taken therefrom.

ior and paranoid ideations. There is also substantial evidence in the record that said disorder would adversely affect respondent's ability to parent Samual. According to uncontradicted testimony from clinical psychologist Dr. John P. Parsons, the prognosis for persons afflicted with personality disorders such as the one from which respondent suffers is poor, because such persons do not believe that they have a problem and, therefore, they do not pursue treatment. In addition, the record indicates that, in accordance with Dr. Parsons' recommendations, DCYF specifically included attendance at counseling sessions as one of respondent's tasks for reunification.[3] Nevertheless, respondent stopped attending the counseling sessions in November of 2003.[4] It should also be noted that the DCYF caseworker assigned to this case testified at length about what she characterized as the paranoid ideations that respondent exhibited.[5]

The record also reveals that DCYF had referred respondent to an intensive parenting program at the Children's Museum. Although respondent did complete a substantial portion (but not all) of that program, a clinician from the program stated in a report about respondent's progress that she had many concerns about respondent and his parenting ability. Specifically, she stated that respondent exhibited

what she perceived to be suspicious and sometimes paranoid behavior. The clinician concluded that "Kyle's mental health difficulties, his homelessness, and lack of employment will impede his ability to provide for and parent Samual."

Doctor Parsons also testified that people suffering from respondent's disorder may have difficulty maintaining close relationships in addition to difficulty maintaining employment and housing. There is evidence in the record that respondent was unemployed as of August of 2003 and homeless as of October of 2003 and that he remained homeless at the time of trial, despite having signed a second reunification plan in November of 2003, which plan listed as one of respondent's tasks for reunification the maintaining of a safe and stable environment for Samual.

In addition to finding that respondent was unfit to parent Samual, the trial justice also found that terminating the respondent's parental rights would be in Samual's best interests.[6] After reviewing the record in light of the applicable statutory provisions, we perceive no error in the trial justice's finding in this respect.

Because our review of the record indicates that there is legally competent evidence to support each of the trial justice's findings, we affirm the Family Court's decree terminating the respondent's parental

3. It is significant that, pursuant to a Family Court order dated May 7, 2003, the tasks listed in that reunification plan were placed on the record as conditions of reunification.

4. The psychotherapist who conducted the sessions with respondent also testified at trial that respondent "demonstrated a clear pattern of paranoid ideations" and that respondent was a "poor candidate for * * * successful treatment."

5. As examples of these ideations, the caseworker testified that respondent believed that another DCYF caseworker and a DCYF supervisor were involved in "black market baby-

selling." In addition, she testified that respondent had provided a justice of the Family Court (at an earlier proceeding) with an e-mail he had written to the FBI and to the CIA regarding allegations that DCYF personnel were involved in kidnapping, robbery and "baby stealing."

6. In the course of reaching her conclusion as to the best interests of the child, the trial justice found that Samual has been living in the same pre-adoptive home since birth and that Samual has bonded with the members of his foster family.

rights. The papers in this case may be remanded to the Family Court.