**In re STEVEN D. et al.**

**No. 2009–62–Appeal.**

Supreme Court of Rhode Island.

June 29, 2011.

---

———

Thomas J. Corrigan, Jr., Esq., Department of Children, Youth and Families, for DCYF.

Shella R. Katz, Esquire, Court Appointed Special Advocate, for CASA.

Christopher Gontarz, Esq., Middletown, for Respondent Father.

Janice Weisfeld, Office of the Public Defender, for Respondent Mother.

Present: SUTTELL, C.J., GOLDBERG, FLAHERTY, ROBINSON, and INDEGLIA, JJ.

## OPINION

Justice ROBINSON for the Court.

The respondents, Kathleen D. and Ronald D., appeal from a Family Court decree terminating their parental rights with respect to their two children, Steven D. and Zachary D. For the reasons set forth in this opinion, we vacate the decree of the Family Court.

## I

### Facts and Travel

On September 14, 2007, the Rhode Island Department of Children, Youth and Families (DCYF) filed petitions to terminate the parental rights of Kathleen and Ronald with respect to their two children, Steven (born September 22, 1997) and Zachary (born November 1, 2000). Pursuant to G.L.1956 § 15–7–7(a)(3), DCYF alleged the following grounds for the termination of parental rights (TPR): that the children had been placed in the legal custody or care of DCYF for at least twelve months; that the parents were offered or received services to correct the situation which led to the children being so placed; and that there was not a substantial probability that the children would be able to return safely to respondents' care within a reasonable period of time considering the children's age and the need for a permanent home.[1]

---

1. General Laws 1956 § 15–7–7(a)(3) provides as follows:
    "(a) The court shall, upon a petition duly filed by a governmental child placement agency or licensed child placement agency after notice to the parent and a hearing on the petition, terminate any and all legal rights of the parent to the child, including the right to notice of any subsequent adoption proceedings involving the child, if the court finds as a fact by clear and convincing evidence that:
       " * * *

    "(3) The child has been placed in the legal custody or care of the department for children, youth, and families for at least twelve (12) months, and the parents were offered or received services to correct the situation which led to the child being placed; provided, that there is not a substantial probability that the child will be able to return safely to the parents' care within a reasonable period of time considering the child's age and the need for a permanent home[.]"

A trial on the petitions to terminate parental rights was held before a justice of the Family Court on various dates over the course of six months.[2] The following facts and background information have been culled from the record of the Family Court proceedings, including most notably the voluminous testimony elicited at trial.

## A

### Removals, Case Plans, and Referrals

Steven and Zachary were first removed from the custody of Kathleen and Ronald on July 21, 2005. The removal was not occasioned by any alleged misconduct on the part of the parents but because Kathleen was hospitalized. Her eleven-day hospital stay was a result of having suffered cardiac arrest attendant upon a viral infection; indeed, during much of that time, she was in a medically induced coma. A nurse called DCYF out of concern that Ronald would not be able to care for Steven and Zachary by himself due to his own health problems, which included epilepsy and rheumatoid arthritis.

On July 22, 2005, shortly after Kathleen was hospitalized, DCYF filed in the Family Court *ex parte* neglect petitions in conjunction with a request for an order of detention; the court granted those *ex parte* petitions. The children were removed and placed with Ronald's sister, and DCYF assigned caseworker Jennifer Jawharjian to work with respondents. Ms. Jawharjian first met with respondents in August of 2005 in order to collect background information and develop a case plan for the family. She testified at the

trial of the instant case that, at that meeting, respondents were upset and uncooperative, swore at her, and expressed the view "that there was no reason for [DCYF] to be involved."

Ms. Jawharjian then proceeded to prepare initial case plans for Steven and Zachary. The plans were completed by the end of August, and each plan had a stated goal of reunification. The plan for Steven explicitly noted that he was "a happy child" and that he looked after his younger brother, who had developmental disabilities. The plan further stated:

> "The family has a strong bond with one another and are always happy to see on[e] another during weekly visitations."

The plan for Zachary similarly stated that the family had a "strong bond," and it noted that respondents had been accessing services in order to address Zachary's developmental disabilities.

The plans indicated that the children had been removed from respondents' home when Kathleen was hospitalized because Ronald was not considered an appropriate caretaker "due to medical issues and alcohol use."[3] The stated objectives of each case plan were that Kathleen and Ronald would (1) develop and maintain a substance-free lifestyle; (2) prevent domestic disputes from affecting their children; and (3) cooperate with DCYF. In furtherance of these objectives, the plans stated that respondents agreed to complete the following tasks: (1) refrain from using any illegal or intoxicating substances, including alcohol; (2) cooperate with a substance

---

**2.** The trial took place on the following dates in 2008: January 11, March 18, April 2, April 4, April 21, April 28, May 14, May 29, and June 20. We would comment that, absent special circumstances, conducting a trial in such a chronologically staggered manner is not an optimal practice.

**3.** On cross-examination during the Family Court trial, Kathleen testified that Ronald had told her that, when DCYF personnel came to the house during her hospitalization in 2005, he was "sitting on the porch drinking a beer" while the children were playing outside.

abuse evaluation and follow treatment recommendations; (3) submit to supervised urine screens, both random and scheduled; and (4) utilize a network of "clean and sober supports such as church, AA/NA, and community providers." The plans further stated that respondents agreed to refrain from physically or verbally assaulting each other and also agreed to complete domestic violence counseling as recommended. With respect to visitation, the plans stated that, during a court hearing on August 25, 2005, respondents had agreed (1) to comply with scheduled visits; (2) not to be under the influence of drugs or alcohol or have "the smell of liquor about [them]" when attending those visits; and (3) generally to cooperate with the recommendations of service providers and of DCYF. Kathleen signed the case plans, although she noted that she disagreed with them; Ronald refused to sign the case plans.

Ms. Jawharjian referred both respondents for substance abuse evaluations. In addition, she referred Kathleen for domestic violence and mental health counseling, and she referred Ronald for anger management counseling. The respondents both underwent substance abuse evaluations at Northern Rhode Island Community Services in August of 2005; those evaluations concluded that neither Kathleen nor Ronald had a substance abuse problem at that time.

Ms. Jawharjian testified at trial that Kathleen was at that time participating in mental health counseling with Dona Harrower, a social worker at Family Resources Community Action (Family Resources) in Woonsocket.[4] Ms. Jawharjian further testified that Ronald went to Tri–Hab[5] to discuss an anger management program, but she added that he did not participate in the program because he indicated to her that it would be too difficult for him to travel to the Tri–Hab facility in light of what Ms. Jawharjian described as his "health conditions."

During this time period, respondents had weekly supervised visits with Steven and Zachary. Ms. Jawharjian testified that respondents consistently attended the visits and that they were "very affectionate to their children." However, she also stated that respondents would often swear at her and that Ronald gave her "the finger" in front of the children, and she stated that on occasion Kathleen "smelled of alcohol." According to Ms. Jawharjian, when she expressed her concern to Kathleen that "substance abuse could not occur during visitations," Kathleen told her that "she was of age" and had drunk "hours before" the visit took place.

On November 17, 2005, respondents admitted to dependency; and the Family Court entered an order committing Steven and Zachary to the care, custody, and control of DCYF. The court subsequently issued a decree dated December 15, 2005, providing that the children could return home on condition that respondents comply with the following services: engaging in "outpatient counseling;" participating in the CEDARR and CASSP programs;[6] at-

---

4. Family Resources Community Action provides community-based social services to low-income Rhode Island families.

5. Tri–Hab is a service provider that assists individuals with substance abuse problems and co-occurring mental health disorders.

6. CEDARR, or "Comprehensive Evaluation, Diagnosis, Assessment, Referral and Re-evaluation," refers to a network of programs that provide community-based services for children with special health needs and their families. CASSP refers to the "Child and Adolescent Services System Program," which provides mental health care for children with serious emotional disorders.

tending Alcoholics Anonymous (AA) meetings; and availing themselves of parent aide services and anger management counseling. The decree "strongly urge[d]" respondents not to drink alcohol, specifying that such abstention would be a condition of the children's placement in the home.

Ms. Jawharjian was subsequently transferred to a different DCYF office, and respondents' case was then assigned to a new caseworker, Greg. Iafrate. Mr. Iafrate proceeded to develop a second set of case plans for the family, dated December 13, 2005; those case plans had the stated goal of maintaining the children at home. As with the August 2005 plans, Kathleen and Ronald were to (1) develop and maintain a substance-free lifestyle; (2) prevent domestic disputes from affecting their children; and (3) cooperate with DCYF and the Family Court. The December 2005 case plans also indicated that Kathleen and Ronald had been ordered by the court to refrain from using alcohol; the plans further stated that respondents would continue to seek counseling from Family Resources "to deal with mental health issues and anger management" and that they would cooperate with home-based services from ARC of Northern Rhode Island [7] and with parent aide services. The plans also stated that Kathleen would continue to participate in AA meetings and would provide DCYF with documentation of her attendance. In contrast with the August 2005 case plans, however, the December plans made no mention of further substance abuse evaluation or treatment, and they no longer required respondents to submit to urine screens. Both Kathleen and Ronald signed the December case plans, and they indicated that they were in agreement with the plans.

Mr. Iafrate subsequently left his employment with DCYF, and another caseworker, Marcie Baker, was assigned to work with respondents in January of 2006. On January 20, 2006, DCYF filed an emergency motion in the Family Court seeking a change of placement, and the children were briefly removed from respondents' home. On January 26, 2006, the Family Court determined that the children should be returned to respondents' home; an order entered on February 21, 2006, which stated that the. children's placement at home was to be at the discretion of DCYF and that a DCYF representative was to go to the home once per week; it further ordered Kathleen "to cooperate with all services," including a psychiatric evaluation and home-based services.

Thereafter, on April 12, 2006, DCYF filed another emergency motion seeking a change of placement. As grounds for removal, DCYF stated that Kathleen had been ordered to cooperate with all services in January of 2006, but that, "upon information and belief," respondents were "refusing to participate" in home-based services for the children. On April 26, 2006, the Family Court ordered that Steven and Zachary be removed from respondents' home, and the children were again placed with Ronald's sister.

On May 25, 2006, Ms. Baker having left the department, yet another DCYF caseworker, Erin Cuddy, was assigned to work with respondents; Ms. Cuddy continued to work with the family through the course of the 2008 termination of parental rights trial. At trial, Ms. Cuddy testified that June 1, 2006 was the first date on which she supervised a visit between the children and respondents at their home. She stated that, during this visit, Kathleen swore at her in front of the children and that she

---

7. ARC of Northern Rhode Island, currently known as The Homestead Group, provides social services to children and adults with disabilities.

also stepped toward her with her middle fingers raised in "an aggressive manner." Ms. Cuddy testified that she told Kathleen that, if such inappropriate behavior continued, she would end the visit; she acknowledged, however, that she did not need to end the visit early on that date.

On July 5, 2006, Ms. Cuddy developed a third set of case plans for the family, each having a stated goal of reunification. The plans noted that the children had been removed due to neglect, alcohol abuse, and "[c]aretaker's [i]nability to [c]ope;" the plans further noted that the "conditions which require [the] continued need for placement" of the children outside the home were the "[p]arents['] alcohol use, mental health, [and] physical health." The plans also stated, however, that the family was "close and appear[s] to have a strong bond with one another." The plans set forth the same objectives as those in the December 2005 plans, and they specified several new tasks—including that respondents would not have any alcohol in their home, that they would participate in a parent-child evaluation, and that they would refrain from swearing at or making threats toward DCYF workers or service providers. The plans also provided for weekly supervised visitations in respondents' home. Both respondents signed the plans and indicated that they were in agreement with their contents.

Ms. Cuddy testified that she continued to include the objectives of maintaining a substance-free lifestyle and preventing domestic disputes in the July 2006 plans because her review of the DCYF record indicated that both parents "had some type of drinking problem" and that there was a history of domestic violence. Ms. Cuddy further testified that she had personally observed respondents "being verbally assaultive and aggressive towards one another," and she testified that the

issue of substance abuse raised in previous case plans had not been "addressed" in that respondents "had not engaged in substance abuse treatment or counseling."

In August of 2006, Ms. Cuddy referred respondents for new substance abuse evaluations at Tri–Hab. Ms. Cuddy testified that this referral "didn't pan out" because Tri–Hab indicated that "the information they received from Kathleen was not accurate information and that they could not develop a strong enough rapport with her to accurately assess her." Ms. Cuddy subsequently referred Kathleen for a new substance abuse evaluation at Family Resources, which was completed in November of 2006; this evaluation concluded that Kathleen did not have a substance abuse problem.

With respect to Ronald, Ms. Cuddy testified that Tri–Hab had recommended that he undergo a neuropsychological evaluation in order "to determine his level of cognitive functioning prior to completing a substance abuse [evaluation]." Ms. Cuddy indicated that she had tried to contact Ronald's neurologist to request that the doctor evaluate his level of cognitive functioning, but she stated that Ronald was "not willing to sign the releases in a timely manner until after he spoke to the doctor * * *." Ronald eventually obtained his neurological records; but, according to Ms. Cuddy, they were not provided to DCYF until July of 2007.

Even though two evaluations had found that Kathleen did not have a substance abuse problem, Ms. Cuddy testified that she smelled alcohol on Kathleen during supervised visits at least four times. Ms. Cuddy stated that she first "suspected that [Kathleen] smelled like alcohol" during a visit on October 5, 2006. She further stated that, during the October 5 visit, Kathleen swore at her after the caseworker told Kathleen not to talk to her children about

the Family Court proceedings. Ms. Cuddy testified that Kathleen had said: "F- - - you. I'll f- - -ing talk about whatever I want to talk about with my kids. You can't tell me what to do." She also testified that Kathleen had threatened her during the visit by stating, "I'm going to get you." Ms. Cuddy stated that she decided to end the October 5 visit ten minutes early due to Kathleen's behavior; she added, however, that Ronald was "begging" her not to end the visit early and told her that his wife "always does this to me" and that he deserved to visit with his children because he had not done anything wrong.

As a result of the October 5 incident, DCYF moved the family's visits from respondents' home to the Pawtucket DCYF office. Ms. Cuddy testified that, when Kathleen arrived for a November 16, 2006 visit at the office, "she smelled like alcohol." According to Ms. Cuddy, at one point during that visit, Zachary ran toward her as if he wanted a hug, but Kathleen told him not to hug the caseworker and "tugged" on his sweatshirt, causing him "to fall to the ground." Ms. Cuddy stated that Zachary began to cry and that Ronald did not attempt to intercede with his wife. Ms. Cuddy indicated that Ronald had similarly not interceded with his wife when she acted inappropriately during the October 5 visit; rather, Ms. Cuddy stated that Ronald "usually [sat] there quietly and [did] not say anything."

On January 7, 2007, the Family Court approved a decree that provided the following: (1) that Kathleen would cooperate with a psychiatric evaluation at Family Resources; (2) that Kathleen and Ronald would cooperate with a parent aide during family visits; (3) that Kathleen would submit to an "alcohol screen" if DCYF determined that it was warranted due to her behavior or if she appeared to be "under the influence" and that, if she refused to submit to the screen, it would be considered positive and the visit would end; and (4) that Ronald would undergo a neuropsychological evaluation.

On January 30, 2007, Ms. Cuddy developed a fourth set of case plans; they had a stated goal of reunification. The plans noted that the "conditions which require [the] continued need for placement" of the children outside the home were: "Unstable mental health, anger management problems, alcohol use." The plans listed objectives similar to those in the July 2006 case plans, but they included a new set of tasks for respondents with respect to visitation—including agreeing (1) to arrive at weekly visits "sober and with a calm demeanor;" (2) to use appropriate language and refrain from making threats of any kind; and (3) to cooperate with the parent aide during and outside of visits. Ms. Cuddy testified that she had become concerned after Kathleen had "cornered" the children during previous visits and followed them too closely and that she therefore assigned a parent aide to assist Kathleen in establishing "appropriate boundaries with the children." Both Kathleen and Ronald refused to sign the January 2007 plans. A notation on the plan stated: "Parents disagree [with] a few items and [want] to review [with] attorneys."

On April 5, 2007, the Family Court ordered that visits be held at Family Resources in Woonsocket instead of the Pawtucket DCYF office, after a parent aide suggested that Family Resources would be a more convenient location because it was closer to respondents' home; further, Family Resources had indicated that it could conduct a Breathalyzer test or a drug test if necessary. Kathleen also continued to participate in anger management counseling at Family Resources with Dona Harrower through April of 2007; accord-

ing to Ms. Cuddy, Ronald also attended counseling with Ms. Harrower individually and sometimes with Kathleen "for his own support or emotional health."

Then, on April 19, 2007, Ms. Harrower attended a supervised visit with respondents and the children at Family Resources because the parent aide could not attend. Ms. Cuddy testified that, when Kathleen arrived at the visit, she "appeared to be intoxicated" and "smelled like alcohol." According to Ms. Cuddy, Ms. Harrower had also smelled alcohol on Kathleen's breath and went to find someone to administer a Breathalyzer test, which Kathleen refused. Ms. Cuddy testified that Kathleen then began yelling at her and at Ms. Harrower, stating that Ronald (in Ms. Cuddy's words) "had just as much to drink as she did prior to that visit." Ms. Cuddy further recalled that Kathleen told her: "I said I wouldn't show up to visits drinking. I never said I wouldn't show up drunk." Ms. Cuddy stated that, while these events were taking place, Ronald was "very quiet" and "didn't do anything at all," although she added that he did request to say goodbye to the children. After the April 19 visit, Kathleen indicated that she no longer wished to attend counseling with Ms. Harrower; Ms. Cuddy testified that a new counselor was assigned but that Kathleen refused to meet with her as well.

The respondents' relationship with various parent aides apparently also ended unsuccessfully. Ms. Cuddy testified that four different parent aides had been assigned to work with the family between December of 2005 and July of 2007. She stated, however, that three of the four aides terminated their services to the family due to respondents' lack of cooperation; the fourth aide had left the agency.

## B

### Petitions for Termination and Family Court Trial

On September 14, 2007, DCYF filed petitions to terminate the parental rights of Kathleen and Ronald pursuant to § 15-7-7(a)(3). (*See* footnote 1, *supra.*) A trial was held over the course of nine days, from January 11 to June 20, 2008. The trial justice heard testimony from Ms. Jawharjian, Ms. Cuddy, Brian Hayden, Ph.D. (a psychologist called as a DCYF witness), as well as from Kathleen and two witnesses who testified on Kathleen's behalf (Carol Lima and N. David Bouley).

### 1. April 2, 2008 Incident and Substance Abuse Test

The trial proceeded in a relatively normal fashion until the third trial date on April 2, 2008. At the commencement of the April 2 proceedings, counsel for DCYF stated that she "was wondering if the parents would submit to a [B]reathalyzer and drug test today." The attorneys for both respondents objected, which objections were sustained by the trial justice.

Later during the day's proceedings, the trial justice observed that Kathleen "was mumbling loudly, grunting and making strange noises."[8] The trial justice indicated at that juncture that he was "not sure" whether Kathleen "was having some sort of emotional disturbance or was under the influence of alcohol or drugs." Due to her disruptive behavior, the trial justice informed counsel for Kathleen that he was

---

**8.** Although the transcript of the April 2, 2008 trial date indicates that Kathleen was creating some kind of disturbance, it does not reveal the precise nature of her behavior. The observations of the trial justice quoted in the text regarding Kathleen's behavior have been taken from his written decision issued after the trial had concluded rather than from the transcript of the trial itself.

prepared to hold her in contempt; he said that, in the alternative, she could submit to substance abuse testing. After a recess, Kathleen agreed to be tested, and the proceedings were adjourned until April 4.

At the April 4, 2008 trial date, respondents did not appear; according to counsel for respondents, Kathleen was ill, and Ronald could not travel to the court alone due to his health. Counsel for DCYF stated that she "wanted to put on the record [that] the last time we were here, mother's substance abuse screen was positive." Counsel for Kathleen objected, but the trial justice indicated that he would not sustain the objection because "the report was very clear that she was beyond the legal limits for alcohol." The trial justice then indicated that, if counsel was contending that the test was not properly conducted, he would charge Kathleen with contempt for having disrupted the court.

### 2. Testimony of Dr. Brian Hayden

The trial continued on April 21 and April 28, 2008, with the testimony of Dr. Brian Hayden, an expert in child and family psychology who was called as a DCYF witness. Doctor Hayden testified that he completed a psychological evaluation of Kathleen on June 14, 2006. Doctor Hayden found that Kathleen was "rather feisty, opinionated, somewhat confrontational, argumentative," and also "somewhat paranoid, anticipat[ing] that people are out to get her or victimize her." He further found that she was "an angry person" who had difficulty dealing with her emotions and had "very little insight into her own sort of way of interacting with other people."

Doctor Hayden noted that, during the evaluation, Kathleen had mentioned "that she was to be in a substance abuse counseling program and that there was a substance abuse evaluation," and he stated that he had "suggested that she continue that." He stated that Kathleen had also informed him that she was attending AA meetings, and he said that he suggested to her that she attend two to three AA meetings a week. Doctor Hayden further testified that Kathleen had told him that she had lost three children when she lived in Florida because Ronald "was accused of domestic violence and they were both accused of alcoholism."

Doctor Hayden testified that he had also observed Kathleen's interactions with Steven and Zachary during a scheduled visitation on July 7, 2006. He stated that, during that visit, Kathleen would yell at Ronald to pay attention to the children and that she swore at "various times." According to Dr. Hayden, Kathleen became defensive when she noticed that he was taking notes; he added that she told Steven that he had to be his own person and that "you can't really trust other people." Although Dr. Hayden was not tasked with evaluating Ronald, he nonetheless testified that he had observed that Ronald had little interaction with Steven and Zachary during the visit until the end, at which point the children had sat with him and they talked about cars together. Doctor Hayden further testified that the children did not seem upset about leaving their parents at the end of the visit.

Doctor Hayden stated that, based on his evaluation, he had recommended that Kathleen continue with individual counseling and that respondents engage in joint sessions with her therapist "because it seem[ed] as though there was a fair amount of conflict between the two of them, namely on the part of [Kathleen] towards [Ronald]." He testified that he suggested that it was important for Kathleen to "acknowledge her alcoholism and her inappropriate actions and language with the children." He noted that, during

the evaluation, Kathleen had "denied that there was anything wrong with her" and "never actually addressed whether she recognized that alcoholism was an issue," although she did admit to him that she went to AA. Doctor Hayden concluded that Kathleen would have to acknowledge her alcoholism and inappropriate behavior for reunification to be successful.

On cross-examination by respondents' attorneys, Dr. Hayden acknowledged that alcoholism was not one of his areas of specialization. He stated that he did not do an alcohol assessment of Kathleen, but he noted that he had administered a "Coping Response Inventory," which inventory yielded a result that was suggestive of someone "who might be likely to use alcohol." He also acknowledged that nothing had occurred during the visit that would indicate that Ronald had a substance abuse problem. He further acknowledged that his conclusion as to the prospects for reunification for the family was not based on Ronald's behavior, but rather it was based on the fact that the children seemed content living with relatives and on his assessment of Kathleen's "overall adjustment."

On cross-examination by the children's guardian *ad litem*, Dr. Hayden was asked whether Kathleen's positive test for alcohol during the April 2, 2008 trial proceedings would put reunification "at risk." Counsel for Kathleen objected that the substance abuse test had not been entered into evidence, but the trial justice stated that it had been entered into evidence, and Dr. Hayden was permitted to respond to the question. Doctor Hayden first answered that, given such a positive test, he "would have serious concerns" about reunification; he then added, however, that he would also need to know if "she had been in ongoing treatment" and had had "a lapse" on that date, or whether she had

not been in treatment for the two years since he last saw her.

### 3. Testimony of Erin Cuddy

Ms. Cuddy, respondents' DCYF caseworker at the time of trial, gave extensive testimony on various dates during the course of the trial. At the April 28, 2008 proceedings, Ms. Cuddy testified that Steven and Zachary had been living with Ronald's sister since April of 2006 and that it was not a pre-adoptive placement. She stated that the children were, at the time of that trial date, registered with Adoption Rhode Island but that respondents had not agreed to sign an affidavit allowing DCYF to actively seek a pre-adoptive family.

Ms. Cuddy also responded to questioning during the April 28 and May 14, 2008 proceedings about the nature of the services provided by DCYF for the purpose of addressing respondents' anger management and substance abuse issues, and about her efforts in that regard. When asked whether either respondent had "complete[d] the goals and objectives in [her] case plans to [her] satisfaction," Ms. Cuddy stated that respondents had not. When asked to explain her answer, Ms. Cuddy responded:

> "One of the goals of the service plans for mother, especially, was for anger management counseling. And as evidenced during visits and interaction with [her], as Kathleen knows, anger management continues to be a problem.
>
> "As far as substance abuse evaluation, formal substance abuse counseling, that never took place at all. And every parent aide as far as parenting is concerned, parent aides all ended services unsuccessfully and discharged the family."

On cross-examination by counsel for Kathleen, Ms. Cuddy stated that Kathleen had participated in anger management

counseling with Ms. Harrower, and she confirmed that the counseling was solely for anger management and had nothing to do with substance abuse. Ms. Cuddy further testified that Ms. Harrower reported that she met with Kathleen regularly and that "in sessions Kathleen presented very well and was doing well and [was] open in their sessions." Ms. Cuddy stated that she "would receive regular updates from [Ms. Harrower] as to how counseling was going and [Ms. Cuddy] expressed concerns to her that the Department had regarding issues that we wanted addressed in counseling."

Ms. Cuddy also confirmed that, on July 13, 2006, she had left a message for Ms. Harrower inquiring whether the counselor would be able to incorporate formal alcohol treatment into her anger management sessions with Kathleen or be able to increase the number of sessions so as to include alcohol treatment. Ms. Cuddy stated that Ms. Harrower had indicated to her "that she could do that in her sessions." When asked if the counseling Kathleen received had "at some point * * * also included substance abuse and alcohol counseling," Ms. Cuddy responded: "I don't believe that it ever actually was included. We did inquire if [Ms. Harrower] would be able to include it." She testified that she was still waiting for Tri–Hab to complete its substance abuse evaluation of Kathleen at that time. Ms. Cuddy confirmed that Kathleen had eventually completed a substance abuse evaluation in the Fall of 2006; when asked why she did not have Ms. Harrower move forward with alcohol counseling for Kathleen at that time, Ms. Cuddy stated that the evaluation had concluded that there were "no signs of an outward problem" regarding alcohol abuse.

Counsel for Kathleen also cross-examined Ms. Cuddy with respect to Ms. Harrower's position regarding reunification.

The children's guardian *ad litem* objected, arguing that Ms. Harrower herself should be called to testify as to her opinion. The trial justice agreed, but he further commented that Kathleen had been sent for testing "and the results came back she was like three times the legal limit for alcohol consumption;" he added that Ms. Harrower "can say from now until doomsday * * * there's no problem. Maybe there's no problem when she goes to see [Ms. Harrower], but there was a problem when [Kathleen] came into court in that condition." At that point, counsel for Kathleen stated for the record that he wanted to call a witness to testify as to how the test was conducted.

### 4. Motion to Suppress the April 2, 2008 Substance Abuse Test Results

On the May 14, 2008 trial date, counsel for Kathleen submitted a motion to suppress the results of the substance abuse test. He argued that DCYF had not presented a witness to testify with respect to the test results when it asked that they be admitted into evidence. The trial justice indicated that it was his recollection that the test results had been put into evidence; but he then declared that, if the results had not in fact been admitted, "I will admit it now upon [DCYF's] motion." Kathleen's counsel continued to argue to the trial justice against the admission of the test results, contending that there had to be foundational testimony for the results to be admitted; to that argument, the trial justice responded: "No, there doesn't have to be." The trial justice did not rule on the motion to suppress the results until the next trial date, May 29, 2008; on that date, Kathleen's counsel rested on his previously articulated arguments in support of his motion to suppress, and the trial justice denied the motion.

### 5. Interviews of Steven and Zachary

The trial justice also conducted separate *in camera* interviews of both children on the May 14 trial date. The trial justice asked Steven if he would like to go home, and he replied, "Yeah, I would." Steven stated that he would like to live with both of his parents. But he further stated that, if his parents were not living together, he would "probably" choose to live with his father; he added, however, that he "probably couldn't because [his father] has a lot of health issues." When asked if his mother could take care of him, Steven responded: "Yeah, she could, probably."

The trial justice then asked Steven about his parents' drinking and anger issues. Steven stated that, when he lived with his parents, they would "sometimes" drink. He further stated that his father "would drink a little, but not a lot because he has to take a lot of medicine." When asked if his mother drank a little or a lot, he responded: "[S]omewhere in the middle." When asked if his mother ever became angry, Steven stated: "Yeah, never at us." He later admitted that his mother sometimes did get angry at him when he did something wrong and that, when she became angry, she would put him "in a time out;" he also confirmed that his mother sometimes used "bad words" but stated that his father did not. The trial justice also asked Steven what he thought "would be the best thing" for him, and Steven replied: "Well, I would think I'd want to go home because I miss my mom and dad a lot, and it's really tough. It's a really tough decision between my aunt and my mom and dad." The trial justice then asked if it would be better at home if his parents did not drink, and Steven agreed.

When counsel for Kathleen asked Steven how he felt about his mother, he responded: "She's good, really good; and she's nice, and I love her, and she takes care of me." When asked if his mother "used to get drunk a lot," Steven replied, "Not a lot." With respect to Ronald, Steven stated that his father had had seizures in front of him; he added that, if it was a mild seizure, it did not scare him. He agreed that, if he lived with his father, he would be able to help him when he had a seizure. When asked if he felt "safe" when his father had seizures, he responded in the affirmative; however, he then stated that he had a stutter, and he agreed that he would get nervous if he had to call 911 should his father be having a seizure.

The trial justice then interviewed Zachary. He stated that he liked living with his aunt, but he also agreed that he enjoyed living at home with his parents. When asked if there were "any problems" when he lived at home or if his mother or father ever became "mad," Zachary answered no. When asked if he would "like to go back home," Zachary replied that he wanted to stay with his aunt; later, however, he stated that he "wouldn't mind living with mom." When asked if he could have his choice between living with his aunt or at home, he stated that he would live at home.

### 6. Testimony of Carol Lima and N. David Bouley

At the next trial date, on May 29, 2008, counsel for Kathleen called two witnesses to testify on her behalf, Ms. Carol Lima and Reverend N. David Bouley.

Ms. Lima testified that she had known Kathleen for five years and had observed Kathleen's interactions with Steven and Zachary in her capacity as the leader of Steven's Cub Scout den. She stated that Kathleen would come to weekly Cub Scout meetings with Steven and Zachary and that Ronald sometimes also attended. Meetings regularly took place at Kathleen and Ronald's home, which Ms. Lima de-

scribed as "always clean." She noted that Steven and Zachary were "always very polite and courteous" and that Kathleen was a "very, very good" mother and had a very close relationship with both boys. Ms. Lima also testified that she had never heard Kathleen swear or yell at the children, but she did indicate that Kathleen would sometimes lose her temper and yell at other parents in the Cub Scout group. When asked whether she had ever smelled alcohol on Kathleen, Ms. Lima responded that she had not; she further stated, however, that she had heard one "complaint" that Kathleen smelled of alcohol. Ms. Lima confirmed that she considered herself a personal friend of Kathleen's and that, although she had seen Kathleen just three weeks before the trial date, she had not seen Kathleen interact with the children since they were removed by DCYF two years earlier.

Reverend Bouley then testified that he had known Kathleen and Ronald in his capacity as a deacon at the church in Woonsocket where the family members were parishioners. He stated that he had known them for around six or seven years and that he saw the family in church on Sundays and that he "talk[ed] to them occasionally." He further stated that Kathleen was a part-time housekeeper in the rectory and would sometimes bring her children with her. He testified that Kathleen "appeared to [have] a normal relationship" with her children and that he had not observed either Kathleen or Ronald acting inappropriately with them.

### 7. Testimony of Kathleen D.

The trial proceedings concluded on June 20, 2008. On that day, Kathleen testified on her own behalf. She stated that her family had been "content" before DCYF entered their lives in 2005 and that, although Ronald's illness was stressful, she taught the children about it and "life was pretty good." Kathleen testified that she was "devastated" when she woke up after being in a coma for eight days and learned that her children had been removed from her home.

Kathleen stated that she did not understand why the children had been removed and that, in her view, Ronald was physically able to care for the children despite his epilepsy. She noted that she had been working full time before her hospitalization in 2005 and that Ronald had been taking care of the children without incident. She also stated that Ronald's condition had worsened and that he began having more seizures than usual after the children were removed, due to what she considered to be his increased stress level.

Although she was very frustrated with DCYF after the children were removed, Kathleen averred that she had had a "great" relationship with Mr. Iafrate, who was the DCYF caseworker assigned to work with the family after the children were returned to respondents' home. According to Kathleen, he was helpful and positive, and she was "very disappointed" when he subsequently left his position at DCYF.

When asked why DCYF had again removed her children in May of 2006, Kathleen testified that it was due to her "non-compliance" with home-based services from ARC of Northern Rhode Island. She stated that she believed the services would have been "very intrusive" and "too much for the children" because ARC staff wanted to come to her home for four hours a day, five days a week; she confirmed that this would have meant that staff would be at the home from the time the children came home from school until a half hour before they went to bed each day. She also stated that ARC wanted to come to Steven's Cub Scout meetings, which he did

not want. However, Kathleen further testified that she had never indicated that she would not allow the services in her home, only that she told the ARC staff that she would prefer if they came "a couple of times a week, but not every single day," which they refused to do.

It was Kathleen's testimony that she believed that she had been cooperative with DCYF. She noted that she had gone to each evaluation for which she was referred, that she had gone to counseling, that she went to weekly visits with her children, and that she "tried to get along with [Ms.] Cuddy and the others at DCYF." She stated that the visits with her children at home "were pleasant," but that when the visits were moved to the Pawtucket DCYF office they were a "nightmare." Kathleen explained that she was "constantly picked on and harassed, told I can't—I'm hugging my children too much." She indicated that her relationship with Ms. Cuddy became strained after the visits were moved out of the home; she admitted that she had sworn at Ms. Cuddy "one time," but she denied that she became angry or that she ever smelled of alcohol when the supervised visits took place at her home.

Kathleen further stated that, in her opinion, Ms. Cuddy had a "personal vendetta" against her, would not listen to her, and "had no intention [of] trying to help us get back together." According to Kathleen, Ms. Cuddy had told her in September of 2006, almost one year before the TPR petitions were filed, that she "would do anything she could to make sure I didn't get my children back because I was no kind of a mother." Kathleen testified that Ms. Cuddy had indicated to her that she did not "believe" various evaluations that had concluded that Kathleen did not have substance abuse or anger problems. For example, Kathleen stated that, after the

Fall 2006 substance abuse evaluation concluded that she did not have a problem with alcohol, Ms. Cuddy rejected the report's results and told her that she was "in denial," stating: "You have a drinking problem. You didn't tell [the evaluator] the truth." Similarly, Kathleen stated that Ms. Cuddy did not agree with the results of a court-ordered psychiatric evaluation and that Ms. Cuddy had told Kathleen that she was "in denial of [her] problems, that [she did] have an anger problem, and [she did] have a drinking problem, so this report can't be accurate."

The trial justice and counsel for DCYF proceeded to question Kathleen about her drinking. Kathleen stated that she did not believe that she had a problem with alcohol, and she denied that she ever had alcohol on her breath during supervised visits with her children. When asked by the trial justice when she had last had a drink, Kathleen responded that she had had a drink three days earlier. Kathleen stated that she did drink "every now and then" but she denied that she had drunk alcohol "while" the Family Court trial "was going on." When asked about the substance abuse test that she had taken at the Family Court on the April 2, 2008 trial date, Kathleen testified that she had not been drinking that morning, but she admitted that she had drunk "[a]bout six beers" the night before the proceedings.

On the June 20, 2008 trial date, counsel for DCYF also asked Kathleen about an incident on June 5, 2008, when DCYF had terminated a supervised visit with respondents and their children early. Kathleen testified that Ms. Cuddy had not told her why she was ending the visit early; she added that she later was told by a DCYF supervisor that Ms. Cuddy had terminated the visit because she believed that Kathleen smelled of alcohol. Kathleen further testified that she had not been drinking on

the day of the visit or the night before. DCYF then called Ms. Cuddy as a rebuttal witness; she stated that, during the June 5 visit, Kathleen "had been slurring her words" and "was repeatedly asking the children the same question" and that she had smelled alcohol on Kathleen's breath after she ended the visit.

### 8. The Family Court Decision and Appeals

On July 2, 2008, the trial justice issued a written decision granting the petitions to terminate respondents' parental rights, and a decree embodying that decision entered on August 13, 2008. The trial justice found that DCYF had shown the following by clear and convincing evidence: (1) that Steven and Zachary would not be able to return safely to respondents' care within a reasonable period of time; (2) that DCYF had "made all reasonable efforts" to reunite the children with respondents; and (3) that it was in the best interests of the children that respondents' parental rights be terminated.

The trial justice found that the children had been in the care, custody, and control of DCYF for approximately two and a half years. He stated that DCYF had implemented at least four case plans with a goal of reunification and that, since the department became involved with the family, "the matter of substance abuse in the form of alcohol has been a matter of great concern [as] has the matter of abuse and anger management."

With respect to Kathleen, the trial justice found by clear and convincing evidence that she "has a substance abuse problem and has had the said problem for a substantial period of time;" he also stated that Kathleen had "received or [had] been offered services to correct the situation to no avail." In support of this finding, the trial justice noted that, although Kathleen re-ported that she did not have a drinking problem, the record evidence indicated "numerous occasions" on which she had smelled of alcohol and one occasion on which a visit with the children was terminated "because of her condition." Further, the trial justice noted that, although she at one point "denied using alcohol during the course of the trial," she later testified that "she had a drink three days prior to her being on the stand." The trial justice also noted that the substance abuse screening test that Kathleen took in the Family Court on April 2, 2008 indicated that she had a blood alcohol level of 0.221, almost three times the legal limit, and he stated that these results had been read into the record. He stated that the record "indicate[d] that the respondent mother was highly intoxicated during one of the days of the trial," and he additionally pointed to Dr. Hayden's testimony that Kathleen had reported losing three other children in Florida due to "alcoholism and lack of anger management" and to Steven's statement that he had seen his mother drink.

In his decision, the trial justice also found by clear and convincing evidence that Kathleen had "a severe anger management problem." In support of this finding, he noted that, although in her testimony Kathleen denied screaming at her husband, the testimony of multiple other witnesses, including Dr. Hayden, indicated otherwise.

With respect to Ronald, the trial justice stated that, although respondent father did not testify, the court had been made aware of his "many health problems" through the testimony of his wife and son; the trial justice added that he was "visually able to ascertain his severe limitation as to physical movement." Specifically, the trial justice observed that Ronald "entered and left the courtroom with the assistance of a

cane and also required the assistance of someone to lean on." The trial justice also noted that testimony indicated that Ronald "drank but not to the extent that his wife drank." The trial justice then stated that Ronald "comes across as a victim who cannot or will not change the situation," and he concluded as follows:

> "[Ronald and Kathleen] appear to be in some sort of symbiotic relationship and are dependent upon each other to fulfill each other[']s needs and to put up with the behavior of the other no matter how outrageous it may seem to others. They are a couple for better or worse."

The trial justice gave "little weight" to the testimony of Ms. Lima because she was a friend of respondent mother who had not seen respondent with her children for approximately two years and therefore was "of little or no assistance" to the court. Similarly, the trial justice stated that he was giving "little weight" to the testimony of Reverend Bouley.

With respect to his *in camera* interviews with Steven and Zachary, the trial justice stated that "[i]t was obvious that the children were conflicted" about whether they would like to return home and live with their parents. However, the trial justice concluded that, although the children were not in a pre-adoptive home at that time, it would be in their best interests that "there be movement from the status quo," and he urged DCYF to locate such a home as soon as possible.

The respondents filed separate notices of appeal.[9] On appeal, Kathleen and Ronald each contend that the trial justice erred in finding: (1) that they were unfit parents; (2) that DCYF made reasonable efforts at reunification; and (3) that termination of parental rights was in the best interests of their children. Kathleen advances two additional arguments, *viz.:* (1) that the trial justice erred in admitting the results of the substance abuse screening test performed during the course of the trial on April 2, 2008; and (2) that the trial justice erred in denying her motion requesting the court to admit a particular psychiatric report into evidence or, in the alternative, to require the state to bear the cost of issuing a subpoena to the author of the report.

## II

### Standard of Review

■ When called upon to review a decision that terminates parental rights, we remain keenly mindful that natural parents have a "fundamental liberty interest" in the care, custody, and management of their children. *See Santosky v. Kramer,* 455 U.S. 745, 753, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982); *see also In re Dayvon G,* 10 A.3d 448, 453 (R.I.2010); *In re Destiny D.,* 922 A.2d 168, 172 (R.I.2007). And we are equally mindful that that fundamental interest does not "evaporate simply because they have not been model parents or have lost temporary custody of their child." *Santosky,* 455 U.S. at 753, 102 S.Ct. 1388; *see also In re Natalya C.,* 946 A.2d 198, 202 (R.I.2008); *In re Nicole B.,* 703 A.2d 612, 615 (R.I.1997). The termination of parental rights is a drastic and irreversible measure, *see In re Kayla N.,* 900 A.2d 1202, 1210 (R.I.2006), and the children as well as their parents "share a

---

9. We note that the respondents' appeals were filed prior to the entry of the final termination of parental rights decree in August of 2008. However, under circumstances such as the instant case presents, this Court will treat a premature appeal as timely filed. *See In re*

*Kayla N.,* 900 A.2d 1202, 1206 n. 6 (R.I.2006); *see also State v. Espinal,* 943 A.2d 1052, 1057 n. 4 (R.I.2008) (citing Article I, Rule 4(b) of the Supreme Court Rules of Appellate Procedure).

vital interest in preventing erroneous termination of their natural relationship." *In re Natalya C,* 946 A.2d at 203 (quoting *Santosky,* 455 U.S. at 760, 102 S.Ct. 1388).

■ Accordingly, due process requires that, before the state may terminate a parent's rights in his or her children, the state must support its allegations *by clear and convincing evidence. See* § 15-7-7(a); *see also In re Victoria L.,* 950 A.2d 1168, 1174 (R.I.2008) ("[T]he state [must] support its allegations by at least clear and convincing evidence."); *In re Nicole B.,* 703 A.2d at 618.[10] "[T]he clear and convincing standard requires that the fact-finder form a clear conviction without hesitancy of the truth of the precise facts in issue." *In re Adner G.,* 925 A.2d 951, 957 (R.I.2007) (internal quotation marks omitted); *Parker v. Parker,* 103 R.I. 435, 442, 238 A.2d 57, 61 (1968).[11]

■ In reviewing a decree terminating parental rights, we bear in mind the foregoing considerations as we engage in a three-step process. *See In re Pricillion R.,* 971 A.2d 599, 604 (R.I.2009); *In re Brooklyn M.,* 933 A.2d 1113, 1122 (R.I. 2007). When we engage in that process, we (1) examine the trial justice's finding of parental unfitness; (2) review the finding

that reasonable efforts at reunification were made by the state agency charged with that duty; and (3) review the finding that termination is in the children's best interests. *See In re Pricillion R.,* 971 A.2d at 604; *In re Brooklyn M.,* 933 A.2d at 1122. In carrying out this process, this Court affords great weight to the factual findings of the trial justice, and they will not be disturbed absent a showing that the trial justice was clearly wrong or that material evidence was overlooked or misconceived. *In re Caleb W.,* 990 A.2d 1225, 1228 (R.I.2010); *In re Jose Luis R.H.,* 968 A.2d 875, 881 (R.I.2009).

## III

### Analysis

#### A

#### Termination of the Parental Rights of Kathleen D.

■ On appeal, Kathleen argues that the trial justice erred in finding that DCYF had proved by clear and convincing evidence that it had made reasonable efforts to encourage and strengthen the parental relationship prior to filing the petitions to terminate her parental rights. It is her contention that, where DCYF had formed the belief that she suffered from a

---

10. *See also Santosky v. Kramer,* 455 U.S. 745, 749 n. 3, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982) (noting that, as of the writing of that decision, the great majority of states required, whether by statute or by court decision, proof by clear and convincing evidence in parental rights termination proceedings).

11. In *Parker v. Parker,* 103 R.I. 435, 442–43, 238 A.2d 57, 60–61 (1968), this Court discussed at some length the meaning of the "clear and convincing evidence" requirement. In the course of that discussion, this Court quoted with approval from an opinion issued by a distinguished federal appellate court, stating as follows:

"One of the more articulate and descriptive definitions of clear and convincing evi-

dence appears in the following portion of an approved instruction to a jury given in *Aetna Insurance Co. v. Paddock,* 5 Cir. [5th Cir.1962], 301 F.2d 807, 811:

'* * * it must be shown by clear and convincing evidence, and by that term is meant the witnesses to a fact must be found to be credible and that the facts to which they have testified are distinctly remembered and the details thereof narrated exactly and in due order and that the testimony be clear, direct and weighty and convincing, so as to enable you to come to a clear conviction without hesitancy of the truth of the precise facts in issue.'" *Parker,* 103 R.I. at 442, 238 A.2d at 61 (omission in original).

serious alcohol abuse problem which it considered to be a major barrier to reunification, the department was required to refer her to alcohol treatment or counseling before petitioning to terminate her parental rights. We agree.

This Court has unequivocally stated that "[a] finding of parental unfitness is insufficient in and of itself for the court to terminate parental rights: subsequent to presenting sufficient evidence to support such a finding, DCYF must additionally demonstrate to the Family Court *that it has made reasonable efforts* to strengthen the parent-child relationship in accordance with the provisions of § 15–7–7(b)(1)." *In re Brooklyn M.*, 933 A.2d at 1125 (emphasis added); *see In re Jose Luis R.H.*, 968 A.2d at 882; *In re Christopher B.*, 823 A.2d 301, 307 (R.I.2003). Section 15–7–7(b)(1) provides in pertinent part as follows:

> "In the event that the petition is filed pursuant to subdivisions (a)(1), (a)(2)(i), (a)(2)(iii), or (a)(2)(vii) of this section, the court shall find as a fact that, prior to the granting of the petition, such parental conduct or conditions must have occurred or existed notwithstanding the reasonable efforts which shall be made by the agency prior to the filing of the petition to encourage and strengthen the parental relationship so that the child can safely return to the family." [12]

We have stated that the reasonable efforts requirement "is a subjective standard subject to a case-by-case analysis." *In re Natalya C,* 946 A.2d at 203; *In re Nicole B.*, 703 A.2d at 618. What constitutes reasonable efforts will "vary with the differing capacities of the parents involved,"

and it is determined by looking at the totality of the circumstances of each case. *In re Kayla N.*, 900 A.2d at 1209 (quoting *In re William, Susan, and Joseph,* 448 A.2d 1250, 1256 (R.I.1982)).

For DCYF to show that it has made reasonable efforts at reunification, we have held that the department must show, *inter alia,* that it has "provided services and other assistance to the parent or parents to ensure that problems preventing discharge from foster care would be resolved or ameliorated * * *." *In re Jose Luis R.H.,* 968 A.2d at 882. It is clear that, "if such services are to have any chance of success in correcting the situation that led to the children's removal from the family home, they must be 'reasonable' in the sense of being capable of remedying the particular problem(s) that caused the children to be removed." *In re Natalya C,* 946 A.2d at 203 (quoting *In re Christopher B.,* 823 A.2d at 315). Although DCYF is not expected to "undertake extraordinary efforts to reunite parent and child," *In re Jose Luis R.H.,* 968 A.2d at 882, the department *is* required to ensure that services were in fact offered or received "regardless of the unlikelihood of their success." *In re Natalya C.,* 946 A.2d at 203 (quoting *In re Manuel P.,* 889 A.2d 192, 198 (R.I.2006)).

In the instant case, DCYF concurs with the finding of the trial justice concerning Kathleen to the effect that "substance abuse in the form of alcohol has been a matter of great concern [as] has the matter of abuse and anger management," and it argues that the trial justice did not err when he found that "there is clear and convincing evidence that the Department

---

**12.** Although § 15–7–7(b)(1) does not specifically state that its provisions apply to a termination under § 15–7–7(a)(3), we have held that a termination under the latter subsection requires the same showing of reasonable efforts as is required under the subsections that are mentioned in § 15–7–7(b)(1). *See In re Christopher B.,* 823 A.2d 301, 315 (R.I.2003); *see also In re Jose Luis R.H.,* 968 A.2d 875, 882 (R.I.2009).

made all reasonable efforts to reunite the children with their parents."

DCYF contends that it made reasonable efforts to address Kathleen's alleged alcohol abuse problems because it (1) referred her for substance abuse evaluations (which, it should be recalled, were completed), and (2) because Kathleen attended AA meetings. The department insists in its brief to this Court: "She reported to [Dr. Hayden] that she was involved with AA; that is a service received, even though she remained in denial that she had a drinking problem up to the last day of trial." DCYF also notes that Dr. Hayden recommended to Kathleen that she continue with AA meetings and "also individual counseling."

However, Kathleen was *never* offered nor did she receive any individual alcohol counseling, which Dr. Hayden clearly indicated was necessary for her to achieve reunification with her children. At trial, Dr. Hayden testified that his evaluation had concluded that Kathleen "had to acknowledge her alcoholism" in addition to her inappropriate behavior, or else he did not believe that reunification "would be successful at all." He testified that Kathleen had mentioned to him "that she *was to be in a substance abuse counseling program* and that there was a substance abuse evaluation," and he stated that he had "suggested that she continue that." (Emphasis added.) He also testified that Kathleen had informed him that she was attending AA meetings, and he said that he suggested that she attend at least two to three of these meetings a week. It is evident that Dr. Hayden believed that Kathleen would benefit from a formal "substance abuse counseling program" and

that he differentiated those services from her attending AA, the latter entity not being a professional provider of substance abuse counseling.[13] We further note that, when asked whether Kathleen's positive test for alcohol during the April 2, 2008 court proceedings would put reunification "at risk," Dr. Hayden stated that he would need to know if "she had been in ongoing *treatment.*" (Emphasis added.)

We are frankly troubled by the fact that DCYF completely failed to refer Kathleen for such treatment, despite the recommendation of Dr. Hayden and despite the continued belief of three of her caseworkers that Kathleen's substance abuse was a primary barrier to reunification. Ms. Jawharjian and Ms. Cuddy both testified at trial that they were very concerned that Kathleen was abusing alcohol. Ms. Cuddy also testified that Kathleen had not completed the goals and objectives of her case plans related to substance abuse, stating: "As far as substance abuse evaluation, formal substance abuse counseling, that never took place at all." Yet, Ms. Cuddy also testified that Kathleen complied with two substance abuse evaluations, both of which concluded that she did *not* have a substance abuse problem. She further acknowledged that Kathleen was never actually referred for formal substance abuse counseling, and she also candidly acknowledged that Kathleen's counseling with Ms. Harrower was solely for anger management.

Ms. Cuddy was clearly concerned enough about Kathleen's apparent alcohol abuse that, as she testified, she had actually contacted Ms. Harrower in July of 2006 to inquire whether she could incorporate formal alcohol treatment into her counsel-

---

**13.** In the "Information on A.A." section of its website, Alcoholics Anonymous describes itself as "a fellowship of men and women who share their experience, strength and hope with each other that they may solve their common problem." Alcoholics Anonymous, http://www.aa.org/ (last visited June 28, 2011).

ing sessions with Kathleen; Ms. Cuddy stated that Ms. Harrower had told her that she could include such treatment. Yet, Ms. Cuddy acknowledged that she did not believe that Ms. Harrower had ever included alcohol counseling in her counseling sessions with Kathleen. Remarkably, Ms. Cuddy testified that she never moved forward with a referral for alcohol counseling for Kathleen because a Fall 2006 substance abuse evaluation concluded that Kathleen did not have an alcohol abuse problem.

Despite the substance abuse evaluation results that were favorable to Kathleen, subsequent case plans created by Ms. Cuddy continued to maintain that Kathleen had to develop and maintain a substance-free lifestyle in order to reunify with her children. Notably, the case plan dated January 30, 2007 indicated that the "conditions which require [the] continued need for placement" of the children outside the home included "alcohol use." The plans included an "objective" page stating that Kathleen would develop a "substance-free lifestyle," and under this objective the plans provided that she would refrain from using alcohol and would cooperate with a substance abuse evaluation. On the same page, the plans noted that this substance abuse evaluation had been "completed" and then provided that DCYF would "[m]onitor family's involvement with counseling program"—a program to which Kathleen was never referred. The plans further stated that DCYF would "provide referrals" when appropriate in order to help her to develop and maintain a substance-free lifestyle. Again, however, the record reflects that DCYF did not make any such referrals.

DCYF argues that its efforts to address Kathleen's alleged substance abuse problems were reasonable and that those efforts failed due to Kathleen's recalcitrance and refusal to acknowledge her drinking problem. For example, Ms. Cuddy testified that one substance abuse evaluator, Tri–Hab, could not complete an evaluation of Kathleen because it could not establish a rapport with her and did not believe that she was providing it with accurate information. Citing our decisions in *In re Michael F.*, 665 A.2d 880, 881–82 (R.I.1995), *In re Samuel Y.*, 896 A.2d 725, 727 (R.I. 2006) (mem.), and *In re Anthony M.*, 773 A.2d 878, 881 (R.I.2001), DCYF states in its brief to this Court that we have held that a parent's "level of cooperation *with offered services* helps to inform the extent to which DCYF efforts were reasonable." (Emphasis added.) It is our view, however, that that is precisely what was missing in the instant case—"*offered* services."

In the case of *In re Michael F.*, 665 A.2d at 882, this Court stated that the respondents' "unwillingness to accept help" clearly placed their child at risk, and we noted that "the department and the court have the duty to request compliance with services offered and the completion of programs to be certain that respondents have, in fact, addressed their problems." In our decision in *In re Samuel Y.*, 896 A.2d at 726–27, we upheld a termination of parental rights where the respondent (1) had been told by DCYF to attend psychotherapy sessions but "stopped attending" after several months and (2) had been referred for an intensive parenting program, which he did not complete. Finally, in *In re Anthony M.*, 773 A.2d at 881, we upheld a termination of parental rights where the respondent had drug and alcohol problems "that severely affected her parenting abilities," but she "refused to avail herself of any services offered by DCYF to help her deal with these problems." The facts of these cases stand in stark contrast to the case before us, in which Kathleen was never "offered" or referred for alcohol treatment or counseling services.

Furthermore, we have unequivocally stated that parents denying that they have a problem that is considered to be a barrier to reunification with their children, or denying that they require services, does not relieve DCYF of its obligation at least to offer services to address the problem. *See In re Natalya C.*, 946 A.2d at 204; *In re Manuel P.*, 889 A.2d at 197–98.

In the case of *In re Manuel P.*, 889 A.2d at 197, we upheld a determination that DCYF had *not* made reasonable efforts to reunify the respondent mother with her children, despite the fact that she was not fully compliant with the case plans and on several occasions *"flat out denied* that either she or her children had any need for treatment." (Emphasis added.) Rather, we agreed with the trial justice that the respondent's noncompliance "[did] not obviate the need for DCYF to provide appropriate services in the first place." *Id.* at 197–98 (brackets in original).

Similarly, in our more recent decision in *In re Natalya C.*, 946 A.2d at 202–04, we unanimously held that DCYF had not proven that it made reasonable efforts at reunification where the respondent mother's depression made it difficult for her to comply with drug counseling, but the department never referred the respondent for any mental health counseling. In that case, DCYF had referred the respondent to a substance abuse treatment program to address her drug use; she went into treatment but relapsed and was subsequently incarcerated for possession of a controlled substance. After her release, she failed to engage in further substance abuse treatment despite being admonished by DCYF to seek such services. *Id.* at 200–01. The record revealed that the respondent's drug counselor believed that her relapses were linked to her mental health problems, but the respondent told her counselor that she was not interested in receiving mental

health care and said that "she would be fine" once reunited with her child. *Id.* at 201.

The trial justice in *In re Natalya C.* found that DCYF had made reasonable efforts at reunification because the respondent had not availed herself of substance abuse treatment services and because there was no legal basis upon which to conclude that the respondent would have availed herself of such services even if she had received mental health treatment; the trial justice also noted that the respondent had never requested such treatment. *In re Natalya C.*, 946 A.2d at 202. We held, however, that the trial justice clearly erred in terminating the respondent's parental rights, stating that "it was wholly unreasonable for DCYF not to include *any* mental-health treatment in [the respondent's] case plans, given that her mental illness was one of the primary barriers to her reunification with [her child]." *Id.* at 204. We specifically stated that the respondent's case was not one in which her recalcitrance had prevented reunification or in which treatment had not resolved the underlying problem; and we said that DCYF's failure to address the respondent's mental health issues "made it highly unlikely that reunification would be successful." *Id.* We further unequivocally stated as follows:

"In so holding, *we explicitly reject the notions that [the respondent's] not wanting and not requesting psychiatric counseling are at all relevant* in determining whether DCYF made reasonable efforts to achieve reunification. As we expect a doctor, not his patient, to prescribe medicine to treat the patient's illnesses, we also expect DCYF to fashion effective case plans to enable reunification between parents and children. It is unreasonable for DCYF to rely on parents like [the respondent], who lack

necessary expertise and perspective, and who labor under the burden of mental-health challenges, to diagnose their own problems and then conjure up effective treatment strategies." *Id.* (emphasis added).

The guardian *ad litem* argues that the facts of the instant case are distinguishable from those at issue in *In re Manuel P.* and *In re Natalya C.* because "the department did offer numerous services [to Kathleen], but it was the parent's recalcitrance that has precluded reunification." Even if, as DCYF contends, Kathleen was in denial as to whether she had a substance abuse problem and may have provided inaccurate information regarding her use of alcohol to evaluators, it is nevertheless clear to us that, if DCYF continued to believe that alcohol abuse was a primary barrier to reunification, then it was required at the very least *to offer services to her* so as to attempt to help her overcome her denial.

Although the record indicates that Kathleen did not want and did not request alcohol counseling, that fact is irrelevant for the purpose of determining whether DCYF made reasonable efforts to achieve reunification; DCYF had an obligation "to fashion effective case plans" that would include offering such alcohol treatment in order to address a major problem that DCYF time and again indicated was precluding Kathleen's reunification with her children. *In re Natalya C.* is very clear as to the existence of such an obligation on the part of DCYF. *See In re Natalya C.,* 946 A.2d at 204. Of course, it is entirely possible that Kathleen would have refused to attend alcohol counseling or that she would not have successfully completed a treatment program, and DCYF is not required to "undertake extraordinary efforts to reunite parent and child." *See In re Jose Luis R.H.,* 968 A.2d at 882 (internal quotation marks omitted). Nevertheless,

Kathleen's denial of her alleged problems did not relieve DCYF of its duty to refer her for services to help her address these problems in the first instance. *See In re Natalya C.,* 946 A.2d at 204; *In re Manuel P.,* 889 A.2d at 197–98.

Further, although Ms. Cuddy testified that she did not refer Kathleen for alcohol counseling because the substance abuse evaluations concluded that she did not have a substance abuse problem, there is no indication in the record that Ms. Harrower could not begin to incorporate alcohol counseling in her sessions with Kathleen. Significantly, when counsel for DCYF was asked at oral argument what referrals the department could have made, given that Kathleen was apparently in denial of her problems, counsel admitted that the case plan *could* have provided that Kathleen was required to go to substance abuse treatment, but he added that there was probably not a lot that the department could do for her because she believed that she did not have a problem. Such a belief on the part of a parent is irrelevant with respect to the initial referral for treatment—because the department must ensure that services are offered or received "regardless of the unlikelihood of their success." *See In re Natalya C.,* 946 A.2d at 203 (quoting *In re Manuel P.,* 889 A.2d at 198).

DCYF also argues that "[a]lcohol was not the only issue of unfitness," and it notes that the trial justice also found that Kathleen had a "severe" anger management problem. The department states that it made reasonable efforts to address this problem because Kathleen attended anger management counseling for two years but nevertheless continued to have problems controlling her anger. However, it is clear from the record that DCYF and its witness Dr. Hayden considered alcohol abuse to be a primary barrier to reunifica-

tion. In fact, Dr. Hayden stated that, if Kathleen did not address her issues with alcohol, he did not believe that reunification "would be successful at all"—thus implying that substance abuse was at least as important a barrier to reunification as anger management. Also, the trial justice in his decision clearly relied heavily on the testimony regarding Kathleen's use of alcohol in finding her an unfit parent, devoting several paragraphs of his rescript decision to pointing in detail to evidence in the record that was supportive of his finding that Kathleen had a substance abuse problem; by contrast, the trial justice wrote only one paragraph describing the evidence that was supportive of his finding that she had a severe anger management problem.[14]

In *In re Natalya C.*, 946 A.2d at 204, the respondent mother had a significant drug abuse problem in addition to her mental health problems, yet we held that it was wholly unreasonable for DCYF not to include mental health treatment in the respondent mother's case plans "given that her mental illness was *one* of the primary barriers to her reunification with [her child]." (Emphasis added.) In view of the totality of the circumstances in the instant case, it is similarly clear that DCYF did not make reasonable efforts to reunify Kathleen with her children when it failed to offer and she did not receive *any* substance abuse treatment or counseling to address what DCYF and its clinical psychologist perceived to be one of the primary barriers to reunification. *See In re*

*Natalya C.*, 946 A.2d at 204; *In re Kayla N.*, 900 A.2d at 1209.

Because we conclude that the trial justice clearly erred in finding that DCYF made reasonable efforts to reunify Kathleen with her children, we shall vacate the Family Court decree terminating Kathleen's parental rights.[15]

**B**

**Termination of the Parental Rights of Ronald D.**

█ On appeal, Ronald argues that the finding of the trial justice that he was an unfit parent was clearly erroneous and was not supported by clear and convincing evidence. We agree.

█ As we have stated, a finding of parental unfitness is "the first [and] necessary step before any termination of parental rights can be initiated." *In re Antonio G.*, 657 A.2d 1052, 1057 (R.I.1995) (internal quotation marks omitted). Further, the state "must prove parental unfitness by clear and convincing evidence in order to satisfy the parent's right to due process." *In re Alexis L.*, 972 A.2d 159, 165 (R.I. 2009). We will uphold a trial justice's finding that the state has shown parental unfitness unless it is clearly erroneous or the trial justice overlooked material evidence. *In re Brooklyn M.*, 933 A.2d at 1121.

In the instant case, DCYF alleged that Ronald was an unfit parent pursuant to the provisions of § 15-7-7(a)(3). The department pointed to the fact that Ronald's

14. We would also note that the record indicates that Kathleen's anger management issues often manifested themselves in conjunction with those instances when DCYF alleged that she was under the influence of alcohol.

15. In view of our conclusion concerning DCYF's failure to make reasonable efforts to reunify with respect to Kathleen, we need not

address the other two steps in the usual appellate analytical process—*viz.*, reviewing the trial justice's finding of parental unfitness and reviewing the trial justice's finding that termination was in the children's best interests. *See In re Pricillion R.*, 971 A.2d 599, 604 (R.I.2009).

children were placed in the custody or care of the department for at least twelve months, that he was offered or received services to correct the situation that led to the children being so placed, and that there was not a substantial probability that his children would be able to return safely to his care within a reasonable period of time. However, the trial justice failed to indicate in his decision how, in view of the provisions of the statute, DCYF had proved Ronald's parental unfitness by clear and convincing evidence.

Although the trial justice specifically found "by clear and convincing evidence" that Kathleen had had a substance abuse problem for a substantial period of time and that she had received or been offered services to no avail and further found that "the evidence is clear and convincing that [Kathleen] has a severe anger management problem," the trial justice made no such finding with respect to Ronald—in fact, he made no findings specifically relating to Ronald's unfitness at all, let alone by clear and convincing evidence. Rather, the trial justice simply noted that Ronald appeared to have physical limitations, that testimony indicated that Ronald "drank but not to the extent that his wife drank," and that he "came across as a victim who cannot or will not change the situation." In his decision, the trial justice made the somewhat opaque observation that Ronald was "in some sort of symbiotic relationship" with his wife, noting that these respondents "put up with the behavior of the other no matter how outrageous it may seem to others" and that they were "a couple for better or worse."

In our opinion, the trial justice's determination that Ronald was an unfit parent was clearly erroneous and did not comport with Ronald's due process right to have his parental unfitness proved by clear and convincing evidence. *See In re*

*Alexis L.*, 972 A.2d at 165. The trial justice failed to make specific findings that would support a determination of parental unfitness beyond noting his observations of Ronald's physical limitations and his apparent victimhood or presence in a "symbiotic" relationship with his wife. These are not sufficient grounds to prove how Ronald, prescinding entirely from Kathleen's case, was unfit to parent Steven and Zachary—especially given the fact that there is no evidence that DCYF ever suggested that he might separate from Kathleen in order to be able to reunify with his children.

Ms. Cuddy testified at trial that, during an October 5, 2006 visit, Ronald was "begging" the caseworker not to end the visit early in reaction to Kathleen's behavior and told her that his wife "always does this to me" and that he deserved to visit with his children because he had not done anything wrong. Although Ms. Cuddy testified that Ronald had never specifically asked that his visits with the children take place at a time other than when Kathleen's visits were scheduled and had never specifically asked to work on a separate plan for reunification with the children, she also admitted that DCYF had never indicated to Ronald that he *could* choose to work on an individual plan for reunification with his children, even after he expressed his frustrations about Kathleen to the caseworker.

Further, there was evidence in the record before the trial justice that Ronald had, in fact, attempted to change his wife's behavior and took an active interest in his children's well-being. On cross-examination by counsel for Ronald, Ms. Cuddy agreed that respondent father had, on more than one occasion, attempted to help Kathleen calm down during visits and during telephone calls with DCYF, although he also often did nothing. Ms. Cuddy testified that, at their first meeting on

June 1, 2006, Ronald "continued to tell [Kathleen] to calm down throughout the visit when she was starting to get riled up." When asked if it was her understanding that "mother was actually interfering with father's relationship with his children," Ms. Cuddy replied: "Based on my observations, yes." Ms. Cuddy also acknowledged that Ronald would frequently call her with questions and concerns about the case plan and about his children and that he would have calm and appropriate conversations with her.

Further, Dr. Hayden testified that his conclusion as to the prospects for reunification for the family was not based on Ronald's behavior, but rather on his assessment of Kathleen's "overall adjustment." He noted that "it seem[ed] as though there was a fair amount of conflict between the two of them, namely on the part of [Kathleen] towards [Ronald]" and that "[s]he seemed very, very frustrated with him."

With respect to Ronald's physical health, although he appeared weak in the courtroom and suffered from a seizure disorder, the trial justice did not address evidence in the record that, prior to DCYF's involvement with the family, Ronald had been taking care of the children without incident while his wife worked full time. There was also evidence that he received help from family members when he needed it. As for allegations of alcohol abuse, Ronald completed a substance abuse evaluation which concluded that he did not have an alcohol problem; and Dr. Hayden also testified that he had observed nothing that indicated that Ronald had a substance abuse problem. In our view, there was insufficient evidence in the record to prove that Ronald's health conditions alone would meet the requirements for a finding of parental unfitness under § 15–7–7(a)(3), including that his conditions would prevent the children from being able to return safely to his care within a reasonable period of time, or that any services had been offered or received by Ronald to address this possible barrier to reunification.[16] Accordingly, we shall vacate the Family Court decree terminating Ronald's parental rights.[17]

C

### Admission of the Substance Abuse Test and Psychiatric Report

■ On appeal, Kathleen has also argued that the trial justice erred in admitting, "without first requiring the state to prove [their] validity," the results of the substance abuse screening test performed at the Family Court during the course of

16. For DCYF to prove parental unfitness under § 15–7–7(a)(3), it not only must show that the child has been placed in the legal custody or care of DCYF for at least twelve months and that there is not a substantial probability that the child will be able to return safely to the parents' care within a reasonable period of time, but it also must show that "the parents were offered or received services to correct the situation which led to the child being placed." We note for the sake of clarity that this requirement is separate from the broader "reasonable efforts" requirement provided in § 15–7–7(b)(1) that must be shown after a finding of parental unfitness is made; however, we have stated that the "language in § 15–7–7(a)(3) requiring DCYF to offer (or the af- fected parent to receive) 'services to correct the situation which led to the child being placed[]' * * * implies an obligation for child-placement agencies such as DCYF to employ reasonable efforts to do so under § 15–7–7(a)(3) as well." *In re Christopher B.*, 823 A.2d at 315.

17. In view of our conclusion that DCYF did not prove Ronald's parental unfitness by clear and convincing evidence, we need not address whether DCYF made reasonable efforts to achieve reunification or whether the termination of Ronald's parental rights would be in the children's best interests.

the trial. Although our determination that the trial justice erred in finding that DCYF had made reasonable efforts to reunite Kathleen with her children is dispositive of her request that we vacate the termination of her parental rights, the issue of the admissibility *vel non* of the April 2, 2008 substance abuse test results may arise again at a future time; therefore, we shall address the issue of whether the admission of those results during the 2008 trial was error. *See Wells v. Uvex Winter Optical, Inc.,* 635 A.2d 1188, 1191 (R.I. 1994) (stating that, even though an erroneous jury instruction required that there be a new trial, the Court would proceed to address certain other issues in order to establish "some guidelines for the new trial").

The record is clear that the test results were not offered by the person who performed the test, nor did any other witness seek to provide a foundation for admitting the test results; rather, counsel for DCYF simply informed the trial justice that the substance abuse test results were positive for alcohol, and she requested that they be admitted. On appeal, DCYF, with commendable candor, concedes that admitting the results of the alcohol test over Kathleen's objection without any testimony "about the nature of the recordkeeping" did not comport with the requirements for admitting such results as a public record pursuant to Rule 803(8) of the Rhode Island Rules of Evidence. However, DCYF then proceeds to contend that, even if the test results were admitted in disregard of

the strictures of Rule 803(8), that evidence was harmlessly cumulative. The department further contends, in the alternative, that the test results were admissible pursuant to the so-called "catchall" provision of Rule 803(24). We disagree with both of DCYF's contentions.

We first note that the record reflects considerable confusion as to whether the document containing the April 2, 2008 substance abuse test results was in fact ever actually admitted as an exhibit at trial. The trial justice dealt with that apparent confusion by stating during the course of the trial that he considered the results to be "on the record;" he added that, if they were not part of the record, then he would "admit" same. Significantly, the trial justice also cited to and relied upon these particular test results in crafting his written decision.

The manner in which the test results were admitted was improper due to the fact that no proper foundation was laid to support their admission. In the instant case, counsel for Kathleen objected that no one had provided foundational testimony with respect to the results before they were admitted. At the April 28, 2008 hearing, counsel requested to "[h]ear from the witness that gave the test," noting that he did not even know what kind of test had been administered to his client.[18] The trial justice agreed, stating: "Okay. Let's do that." The court clerk indicated that the person who administered the test was one John Coyne, but then counsel for DCYF stated that she believed it was a person

---

18. We would note that the sheet of paper which appears in the court's trial exhibit file and contains the substance abuse test results that were read into the record by the trial justice is not a lab report. Rather, it is a form entitled "Request for Substance Abuse Testing," on which Kathleen's name was written, and under the heading "other conditions" were written the words "Alcohol.221" and

"drugs-neg." The form did not indicate who had conducted the test, where or how it had been conducted, nor did it contain any type of seal or signature.

It is not clear that the document in question was in fact a "public record" as that term is used in Rule 803(8) of the Rhode Island Rules of Evidence—an issue that we need not decide.

named Peggy. In response, the trial justice stated: "Whoever gave the test, call that person in, give that information to the counselor." Very significantly, however, such foundational testimony was never provided. Accordingly, the test results should not have been admitted into evidence.

■ It is also our opinion that, contrary to what DCYF has contended in its alternative argument, the test results were not admissible pursuant to the residual exception to the hearsay rule contained in Rule 803(24), commonly referred to as the "catchall" provision. This provision allows a court to admit into evidence a "statement not specifically covered" by the other exceptions to the hearsay rule if that statement has "equivalent circumstantial guarantees of trustworthiness." Rule 803(24). The residual exception is "meant to be reserved for exceptional cases" and is "not intended to confer a broad license on trial judges to admit hearsay statements that do not fall within one of the other exceptions * * *." *Conoco Inc. v. Department of Energy*, 99 F.3d 387, 392 (Fed.Cir.1996) (internal quotation marks omitted); *see also* 5 *Weinstein's Federal Evidence* § 807.02[1] at 807–7 (2d ed.2010) (citing, *inter alia, Conoco Inc.*). The case before us is quite unlike the classic case in which the residual exception is invoked due to extraordinary circumstances necessitating the admission of evidence that does not fall under an exception to the hearsay rule.[19]

Although the admission of the April 2, 2008 test results in this case was improper, we need not decide if such admission constituted harmless error because we are vacating the Family Court decision on other grounds.[20]

## IV

## Conclusion

For the foregoing reasons, we vacate the decree of the Family Court terminating the parental rights of the respondents. The record in this case may be returned to the Family Court.

SUTTELL, C.J., with whom GOLDBERG, J., joins, concurring in part and dissenting in part.

Because we believe there is ample evidence in the record to support the trial justice's decision to terminate Kathleen's parental rights, we respectfully dissent. This Court often has explained that the Department of Children, Youth and Families (DCYF) is not required to "hold[ ] the hand of a recalcitrant parent." *In re Joseph S.*, 788 A.2d 475, 478 (R.I.2002) (quoting *In re Kristen B.*, 558 A.2d 200, 204 (R.I.1989)). Today's holding, however, in effect, requires DCYF not only to hold the hand of an uncooperative (indeed hostile) parent, but also to assure that the parent provides accurate information to an evalu-

---

**19.** *See, e.g., Dallas County v. Commercial Union Assurance Co.*, 286 F.2d 388, 397–98 (5th Cir.1961) (Wisdom, J.) (holding that a fifty-eight-year-old newspaper article describing a contemporaneous fire in the clock tower of a courthouse, which article did not fall under a recognized hearsay exception, was nonetheless admissible where that account was trustworthy, necessary, relevant, and material to the issue of whether lightning caused the tower to collapse).

**20.** Kathleen additionally argues that the trial justice erred in denying her motion requesting the court to admit into evidence a report of a particular psychiatric evaluation that had been requested by DCYF, or, in the alternative, to require the state to bear the cost of issuing a subpoena to the author of the report. We need not reach the issue of whether the failure to admit the report was erroneous, however, because we are vacating the decree of the Family Court on other grounds.

ator so that appropriate referrals for treatment can be made.

The record indicates that during its period of involvement, DCYF executed four series of case plans for Kathleen and Ronald,[21] concerning the necessary steps for reunification with their children, Steven and Zachary. The first set of case plans, dated August 2005, included the objective that both parents "[d]evelop and maintain a substance-free lifestyle." A series of tasks geared toward this objective was explicitly listed: (1) "[r]efrain from using any/all illegal and intoxicating substances, including alcohol"; (2) "[c]ooperate with a Substance Abuse Evaluation scheduled for 8/30/05 at [NRI Community Services (NRI) ] and follow treatment recommendations"; (3) "[c]ooperate with the recommendations of the Substance Abuse eval[uation,] including individual, group, day an[d]/or residential"; (4) "[s]ubmit to supervised urine screens, random and as scheduled"; and (5) "[i]dentify and utilize [a] network of clean and sober supports such as church, [Alcoholics Anonymous (AA), Narcotics Anonymous (NA) ], and community providers." The case plans also required that the parents "not attend visits intoxicated or 'high' (on alcohol or drugs), with the smell of liquor about [them]."

In accordance with one of the aforementioned tasks, DCYF social caseworker Jennifer Jawharjian referred both parents to NRI for substance-abuse evaluations, which both parents completed. The NRI evaluator concluded that neither parent had a substance-abuse problem. In contrast to the evaluator's conclusion concerning Kathleen, however, Ms. Jawharjian testified that there were supervised visits at which Kathleen actually "smelled of al-

cohol." According to Ms. Jawharjian, when she confronted Kathleen with substance-abuse concerns, Kathleen frequently responded that she was "of age" and "could drink alcohol."

Near the end of 2005, a Family Court justice entered a decree that placed the children back at home with both parents, provided that they comply with various services, including, among other things, AA meetings.

A new caseworker was assigned and, in December 2005, the second set of case plans was prepared and signed by both parents. The case plans still included the objective that Kathleen and Ronald "[d]evelop and maintain a substance-free lifestyle." In terms of tasks geared toward this objective, the case plans stated: (1) "[c]ourt ordered to refrain from using any/all illegal or intoxicating substances, including alcohol"; (2) "[u]tilize network of clean and sober supports through AA, NA and other community groups"; and (3) "[p]rovide DCYF with documentation of AA participation and attendance."

In May 2006, a Family Court justice ordered that the children be removed from their home again.[22] DCYF social caseworker Erin Cuddy then was assigned to the case. Pursuant to a court order, Ms. Cuddy referred Kathleen to Brian Hayden, Ph.D. for a psychological evaluation. Kathleen disclosed to Dr. Hayden that she previously had lost three of her children, who were taken away from her in Florida because of allegations of alcoholism against both her and Ronald. Kathleen also reported to Dr. Hayden that she was attending AA meetings. Doctor Hayden testified that, during the evaluation, Kathleen ac-

---

21. Consistent with the majority opinion, we shall refer to the parents by their first names. No disrespect is intended.

22. The children have remained in placement since then.

knowledged that "she was to be in a substance abuse counseling program." Doctor Hayden recommended to Kathleen that she continue the substance-abuse evaluation and counseling and that she "attend at least two to three AA meetings weekly." He believed that, before reunification could occur, Kathleen had to acknowledge her alcoholism.

At a hearing held on July 27, 2006, a Family Court justice ordered a second substance-abuse evaluation for both parents. The orders noted that Dr. Hayden's recommendations were to be "implemented subject to" these new evaluations.

Meanwhile, Ms. Cuddy prepared the third set of case plans, which still included the objective that both Kathleen and Ronald "develop and maintain a substance-free lifestyle." [23]  Ms. Cuddy explained that this objective remained in the case plans because it "had not been completed to the satisfaction of any service provider," and "[i]t appeared after reviewing all of the records * * * that both parents, mother and father, had some type of drinking problem." The tasks listed to achieve this objective included: (1) "[c]ourt ordered to refrain from using any/all illegal and intoxicating substances, including alcohol; this includes not having any alcohol in the home"; (2) "[u]tilize network of clean and sober supports through AA, NA and other community groups"; (3) "[p]rovide DCYF with documentation of AA participation and attendance"; and (4) "pending [a] substance abuse eval[uation]," to "[b]ecome involved with an approved/licensed provider to address diagnosed alcohol abuse and follow any and all recommendations of this provider as given."

Pursuant to the aforementioned July 27, 2006 court orders, Kathleen and Ronald participated in substance-abuse evalua-

tions at Tri–Hab on September 11, 2006. However, "[those] evaluation[s] did not pan out," as Tri–Hab was unable to provide an accurate assessment of either parent. Tri–Hab indicated "that they weren't confident with the information that [Ronald] was providing," and it recommended that he receive a neuropsychological evaluation. Likewise, Tri–Hab "felt that the information they received from Kathleen was not accurate information and that they could not develop a strong enough rapport with her to accurately assess her."

In light of these results, a subsequent court order was issued on October 2, 2006, directing Ronald to complete a neuropsychological evaluation and directing DCYF to refer Kathleen for a third substance-abuse evaluation. Ms. Cuddy referred Kathleen to Family Resources Community Action (FRCA), where Kelly Riel conducted a substance-abuse evaluation in the fall of 2006. Ms. Riel concluded, based upon the information provided, that Kathleen did not have signs of an alcohol problem. During her testimony, Kathleen claimed that her understanding of these results was that she did not need treatment and that she could resume drinking.

Ms. Cuddy testified that before these evaluations of Kathleen occurred, the FRCA anger-management counselor, Dona Harrower, had agreed to incorporate alcohol treatment in her counseling sessions with Kathleen. Ms. Cuddy later explained, however, that formal substance-abuse counseling was not to be included in Ms. Harrower's treatment sessions until the evaluation results were obtained.

Ms. Cuddy also testified that Kathleen smelled of alcohol during at least four supervised visits. Ms. Cuddy specifically recalled a visit on November 16, 2006, when Kathleen arrived smelling of alcohol.

**23.** This set of case plans resumed the goal of reunification.

During that visit, Zachary ran toward Ms. Cuddy to hug her, at which point Kathleen grabbed his sweatshirt hood, causing him to fall to the ground and cry.

After a hearing on January 5, 2007, a Family Court justice issued two decrees requiring that the visits be conducted at DCYF and that Kathleen provide an alcohol screen if she appeared to be under the influence.

Subsequently, Ms. Cuddy prepared the fourth set of case plans, dated January 30, 2007. The case plans again included the objective that both parents "develop and maintain a substance-free lifestyle." The case plans acknowledged that the parents were "[c]ourt ordered to refrain from using any/all illegal and intoxicating substances, including alcohol; this includes not having any alcohol in the home." The case plans also included the mandate recently ordered by the court—that visits occur at DCYF, that both parents arrive to visits sober, and that Kathleen submit to an alcohol screen if DCYF determines that a screen is necessary.

On April 5, 2007, visits were moved to FRCA. Ms. Cuddy testified that when Kathleen arrived for a visit there on April 19, 2007, she smelled of alcohol and appeared to be intoxicated. Pursuant to the court order, Kathleen was asked to submit to a Breathalyzer test. She refused and began to scream and use profanity. According to Ms. Cuddy, Kathleen said that "Ron[ald] had just as much to drink as she did prior to that visit." The visit was ended early, at which point Kathleen further commented: "I said I wouldn't show up to visits drinking. I never said I wouldn't show up drunk." Ms. Cuddy testified that as she was taking the children to the car after that visit, they said to her: "I hate when my mommy gets like that. She used to get like that before."

DCYF filed for termination of parental rights, based on G.L.1956 § 15–7–7(a)(3), in September 2007, and a trial was conducted on the matter from January through June 2008. During trial, the justice conducted in-camera interviews of both Steven and Zachary. Steven stated that although his mom "probably" could care for him, he explained that when he used to live with his mom and dad "sometimes they would, like, drink." He elaborated that, "my mom would drink and my dad would drink a little, but not a lot because he has to take a lot of medicine." When asked if his mother drank a little or a lot, Steven responded, "somewhere in the middle."

At trial on April 2, 2008, after repeated outbursts and disruptive actions by Kathleen, the trial justice ordered her to submit to an alcohol test. During her testimony, Kathleen confirmed that she took an alcohol test on April 2, 2008, but claimed that the results of that test were "impossible" because she had not had a drop to drink that morning; she testified that she drank only six beers the night before, went to bed around 11:30 p.m., did not drink at all the next morning, and had the alcohol test performed around noon. Kathleen also testified, on June 20, 2008, that the last time she drank alcohol was about three days earlier.

A visitation on June 5, 2008, while this trial still was in progress, also was ended early. Ms. Cuddy testified that during the visit, Kathleen was slurring her words and repeatedly asking the children the same questions, to the extent that the children asked her to "[p]lease stop asking" them those questions. Ms. Cuddy ended the visit after twenty to thirty minutes, at which point she could smell alcohol on Kathleen's breath. During her testimony, Kathleen denied drinking on June 5, 2008, or the night before.

Kathleen testified that she does not have an alcohol problem and admitted to drinking only "[e]very now and then." She denied having alcohol on her breath during any of the visits at which Ms. Cuddy was present, including those visits at which Ms. Cuddy informed her that she smelled of alcohol. She further denied ever being told during a visit at her home that she smelled of alcohol.

In July 2008, the trial justice issued a written decision granting the petitions to terminate the parental rights of both parents; a decree reflecting the trial justice's findings was entered on August 13, 2008. In his written decision, the trial justice observed the following:

"[Kathleen] self reports that she has no problem with alcohol. Testimony contradicts this assertion. The record indicates numerous occasions on which [she] smelled of alcohol and on at least one occasion, visitation was terminated because of her condition. The child Steven who made every effort to protect his parents in his interview with the court indicated that he had seen his parents drink. * * *

"[Kathleen] denied using alcohol during the course of the trial but in response to a question by the court stated that she had a drink three days prior to her being on the stand. The record of the case indicates that [Kathleen] was highly intoxicated during one of the days of the trial.

"Dr. Hayden testified that [Kathleen] reported the loss of three other children in Florida which was connected with alcoholism and lack of anger management.

"The court finds by clear and convincing evidence that [Kathleen] has a sub-

stance abuse problem and has had the said problem for a substantial period of time, and that she has received or has been offered services to correct the situation to no avail.

" * * *

"[Ronald] did not testify. * * * There was testimony that [he] also drank but not to the extent that his wife drank. [Ronald] comes across as a victim who cannot or will not change the situation. [Kathleen] and [Ronald] appear to be in some sort of symbiotic relationship and are dependent upon each other to fulfill each others [sic] needs and to put up with the behavior of the other no matter how outrageous it may seem to others. They are a couple for better or worse."

In reviewing cases involving the termination of parental rights, this Court "examine[s] the record to determine if legally competent evidence exists to support the trial justice's findings." In re Alexis L., 972 A.2d 159, 165 (R.I.2009) (quoting In re Corryn B., 914 A.2d 978, 981 (R.I.2007)). Those findings are given great weight and will not be overturned unless they are "clearly wrong or the trial justice misconceived or overlooked material evidence." Id. (quoting In re David L., 877 A.2d 667, 671 (R.I.2005)).

Kathleen argues on appeal, and the majority agrees, that the trial justice erred in finding that DCYF had made sufficient reasonable efforts to achieve reunification.

This Court has established that DCYF must make reasonable efforts to encourage and strengthen the parental relationship and reunite the family prior to filing the petition to terminate parental rights under § 15–7–7(a)(3).[24] In re Manuel P., 889

---

24. Even though G.L.1956 § 15–7–7(b)(1), which sets forth the reasonable-effort requirement, actually is silent about whether reasonable efforts are required if a petition is filed under § 15–7–7(a)(3), this Court has construed the statute to indeed apply to petitions

A.2d 192, 196 (R.I.2006); *In re Christopher B.*, 823 A.2d 301, 315 (R.I.2003). The services offered or received that amount to reasonable efforts should be designed to address or correct the situation that led to the children's removal and placement in DCYF care or custody. *In re Jose Luis R.H.*, 968 A.2d 875, 882 (R.I.2009); *In re Christopher B.*, 823 A.2d at 315. This reasonable-efforts requirement has been described by this Court as "a subjective standard subject to a case-by-case analysis, taking into account, among other things, the conduct and cooperation of the parents." *In re Jose Luis R.H.*, 968 A.2d at 882 (quoting *In re Natalya C.*, 946 A.2d 198, 203 (R.I.2008)).

Kathleen contends that "no efforts" were made to address her drinking problem, and the majority indeed finds that "Kathleen was never 'offered' or referred for alcohol treatment or counseling services." We, however, are of the opinion that DCYF did make reasonable efforts and did offer services. Kathleen was referred to three different agencies for substance-abuse evaluations. An evaluation is a necessary first step, and an effort made by DCYF, to determine appropriate treatment or counseling services.

Here, no services were identified through the evaluations because one agency did not believe Kathleen had provided accurate information and the other two agencies concluded that she did not have an alcohol problem. These conclusions, however, fly in the face of the plethora of evidence in the record that Kathleen attended at least five visitations smelling of alcohol, the most recent of which was on June 5, 2008, long after the termination trial itself had started. More significantly, Kathleen's own statements and testimony belie the assessments that she did not have an alcohol problem, perhaps none more dramatically than her comment to social caseworker Ms. Cuddy, at a visitation, that "I said I wouldn't show up to visits drinking. I never said I wouldn't show up drunk." At trial, when asked if she thought it would be appropriate to drink when caring for a child, she responded "if I'm watching a ball game and my son is with me, a few beers isn't going to hurt." In addition, she testified that on the very night before a particular trial date she had consumed six beers.

The majority seemingly recognizes the disconnect between the evaluation results and the overwhelming evidence of Kathleen's alcohol abuse; it states that her "denial of her alleged problems did not relieve DCYF of its duty to refer her for services to help her address these problems in the first instance." DCYF, however, did more than just make three referrals for substance-abuse evaluations. Ms. Cuddy testified on cross-examination that she also arranged for Ms. Harrower to incorporate alcohol counseling into her sessions with Kathleen. Moreover, DCYF recommended that Kathleen attend AA meetings and Kathleen reported to Dr. Hayden that she was attending these meetings.[25] Although we can only speculate as to what additional services DCYF might have offered Kathleen to address her alcohol issues, it is clear that she did at least receive services through AA.

This Court has recognized that DCYF does not have to make extraordinary efforts, guarantee success, or be burdened

---

filed under § 15–7–7(a)(3). *See In re Christopher B.*, 823 A.2d 301, 315 (R.I.2003).

**25.** Although these substance-abuse services were provided by AA, and not directly by DCYF, they still are acknowledged as services offered and received, as the statute does not require that DCYF be the sole provider of the services. *See* § 15–7–7(a)(3); *In re Raymond C.*, 864 A.2d 629, 634 (R.I.2005).

with "holding the hand of a recalcitrant parent." *In re Joseph S.*, 788 A.2d at 478 (quoting *In re Kristen B.*, 558 A.2d at 204); *accord In re Jose Luis R.H.*, 968 A.2d at 882. Rather, what matters is whether DYCF made reasonable efforts to address the problem, and they indeed did so here.

We respectfully find that the majority's reliance on *In re Natalya C.* is misplaced. In that case, this Court vacated a decree terminating parental rights when DCYF had offered the mother sufficient services addressing her substance-abuse issues, but failed to provide "*any* " treatment for mental-health concerns that DCYF should have known about on account of the mother's medical records. *In re Natalya C.*, 946 A.2d at 203–04. In light of the numerous alcohol evaluations conducted and the AA meetings arranged and attended, we do not believe that it accurately can be said that, here, DCYF failed to provide "*any* " substance-abuse treatment for Kathleen.

In addition to the evidence of Kathleen's failure to maintain a substance-free lifestyle, the record is replete with evidence of incidents when she acted in a hostile and belligerent manner, notwithstanding her participation in anger-management counseling with Ms. Harrower. Ms. Jawharjian and Ms. Cuddy testified that both parents frequently were verbally abusive to each other and to the social caseworkers and that they often used profanity and vulgarity in the presence of the children. Moreover, Ms. Cuddy testified that three separate parent aides were provided through FRCA, but that each one terminated services due to lack of cooperation on the parents' part.

In summary, we believe that there is ample legally competent evidence in the record to support the trial justice's decision terminating Kathleen's parental rights under § 15–7–7(a)(3). In our opinion, under these circumstances, DCYF offered reasonable services to her and she did, in fact, receive services to address her substance-abuse problem. With respect to Ronald, we agree with the majority that the trial justice did not sufficiently articulate a finding of unfitness. Accordingly, we would affirm the decree of the Family Court as it pertains to Kathleen and remand the case for more complete findings relative to Ronald.